IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SCOTT K. MARLAND and JENNIFER D. MARLAND, as conservators for the minor child, J.S.M.,<br><br>               Plaintiffs,<br><br>v.<br><br>ASPLUNDH TREE EXPERT CO., a Pennsylvania corporation,<br><br>               Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL OR REMITTITUR, AND GRANTING PLAINTIFFS' MOTION FOR THE INCLUSION OF PRE-JUDGMENT INTEREST, POST-JUDGMENT INTEREST AND COSTS IN THE FINAL JUDGMENT<br><br>Case No. 1:14-CV-40 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant Asplundh Tree Company's Renewed

Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for a New Trial or

Remittitur, and on Plaintiffs Scott and Jennifer Marland's Motion for the Inclusion of Pre-

Judgment Interest, Post-Judgment Interest and Costs in the Final Judgment. For the reasons set

forth below, the Court will deny Defendant's Motion and grant Plaintiffs' Motion.

## I. BACKGROUND

Plaintiffs Scott and Jennifer Marland (collectively, "Plaintiffs") initiated suit against

Defendant Asplundh Tree Company ("Defendant") on behalf of their minor child, J.S.M., who

was electrocuted by a severed powerline.

Defendant is a tree trimming company specializing in pruning trees near powerlines.

Bountiful City Light and Power ("BCLP"), the owner of the powerline at issue, entered into a

contract with Defendant in which Defendant agreed to assist BCLP with line clearance. Pursuant

to its contract with BCLP, Defendant trimmed two large Siberian elm trees at Lyle Henderson's property, located at 741 West 3200 South in Bountiful, Utah, on September 27, 2005. One of these Siberian elm trees produced a branch which broke from the tree and landed across the powerline at issue. On June 30, 2009, the fallen branch caused the powerline to sever and fall into the backyard of Wendy Marland, where J.S.M.—then two years old—was playing. The fallen line electrocuted J.S.M. and caused him to suffer severe injuries.

Beginning on February 7, 2017, the Court conducted a ten-day jury trial regarding the alleged fault of Defendant in causing J.S.M.'s injuries. Plaintiffs argued that Defendant was negligent in failing to remove or recommend removal of the subject tree and/or in failing to properly trim the subject tree to prevent excessive regrowth, and that its negligence was the cause of J.S.M.'s injuries. Defendant argued that it was not negligent and, even if it were, its negligence was not the cause of J.S.M.'s injuries. Defendant further argued that BCLP, Lyle Henderson, and Wendy Marland were at fault for J.S.M's injures. Defendant sought to apportion fault to each of these non-parties accordingly.

On February 13, 2017, upon the conclusion of Plaintiffs' case-in-chief, Defendant made an oral motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure on the basis that Plaintiffs had failed to present sufficient evidence to show Defendant was negligent. Alternatively, Defendant moved for partial judgment as a matter of law on the basis that Plaintiffs' evidence was insufficient to support an award for lost future earning capacity. The Court denied the motion.[1]

---

[1] *See* Docket No. 213.

On February 21, 2017, the matter was submitted to the Jury. Later that evening, the ten-person empaneled Jury returned a verdict in the amount of $3,401,739.00 in favor of Plaintiffs. The Jury awarded $429,424.00 for future impairment to earning capacity; $1,950,000.00 for non-economic damages, and $1,022,315.00 for past and future medical expenses. The Jury found Defendant was 100% at fault and apportioned no fault to BCLP, Lyle Henderson, or Wendy Marland.

## II. STANDARDS OF REVIEW

### A. JUDGMENT AS A MATTER OF LAW

Under Rule 50(a)(1) of the Federal Rules of Evidence, a court may grant a motion for judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[2] In considering a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[3] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[4] Thus, "a  motion for a judgment as a matter of law is cautiously and sparingly granted,"[5] and "is improper unless the evidence so overwhelmingly favors the moving party as to permit no other rational conclusion."[6]

---

[2] Fed. R. Civ. P. 50(a)(1).

[3] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[5] *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996).

[6] *Shaw v. AAA Eng'g & Drafting Inc.*, 213 F.3d 519, 529 (10th Cir. 2000).

A party that has made a motion for judgment as a matter of law under Rule 50(a) prior to a jury verdict may renew that motion under Rule 50(b) after judgment is rendered. However, the "the renewed motion's scope is restricted to issues developed in the initial [Rule 50(a)] motion."[7]

## B. NEW TRIAL

Rule 59(a)(1)(A) provides that a new trial may be granted "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."[8] "In deciding a new trial motion based on insufficiency of the evidence, a district court must analyze whether the verdict 'is clearly, decidedly or overwhelmingly against the weight of the evidence.'"[9]

## C. REMITTITUR

A district court may reduce a jury award under the doctrine of remittitur if the jury's award of damages is "so grossly excessive as to shock the judicial conscience."[10] However, "[a] district court abuses its discretion in ordering a remittitur 'when the size of the verdict turns upon conflicting evidence and the credibility of the witnesses.'"[11] The Jury's award should therefore stand "so long as it is not so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial."[12]

---

[7] *Michael Found., Inc. v. Urantia Found.,* 61 F. App'x. 538, 544 (10th Cir. 2003).

[8] Fed. R. Civ. P. 59(a)(1)(A).

[9] *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009)).

[10] *Prager v. Campbell Cty. Mem'l. Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013).

[11] *Id.* at 1061–62 (quoting *Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994)).

[12] *Id.* at 1062 (quoting *Palmer*, 31 F.3d at 1508).

III. DISCUSSION

Defendant first argues it should be granted judgement as a matter of law because no reasonable jury could have concluded that Defendant breached its duty of care. Alternatively, Defendant argues it should be granted partial judgment as a matter of law regarding the damages award related to J.S.M.'s purported brain injury. If the Court denies Defendant's request for judgment as a matter of law, either in whole or in part, Defendant moves for a new trial on all grounds raised in Defendant's motion for judgment as a matter of law and additionally moves for a new trial on the issue of fault apportionment. Finally, Defendant moves for an order of remittitur or a new trial to determine damages.

A. BREACH OF DEFENDANT'S DUTY OF CARE

At trial, Plaintiffs argued Defendant was liable for J.S.M.'s injuries under a theory of negligence. Therefore, in accordance with Utah law, Plaintiffs were required to present evidence that (1) Defendant owed J.S.M. a duty of care; (2) Defendant breached that duty of care; (3) J.S.M.'s injury was proximately caused by Defendant's breach; and (4) J.S.M. suffered damages as a result of the injury.[13]

Defendant argues that it should be granted judgment as a matter of law or, in the alternative, a new trial because no reasonable jury could have found that Defendant breached its duty of care. At trial, Plaintiffs presented evidence that Defendant breached its duty of care by failing to remove or recommend removal of the subject tree and/or improperly pruning the subject tree by performing a stub cut on the branch that caused the accident. Defendant argues that (1) Plaintiffs presented no evidence establishing that Asplundh's failure to remove the tree

_____
[13] *See Webb v. Univ. of Utah*, 2005 UT 80, ¶ 9, 125 P.3d 906.

breached its duty of care; and (2) the circumstantial evidence presented at trial established that BCLP made the stub cut, not Asplundh.

Plaintiffs presented sufficient evidence by which the Jury could reasonably infer that Defendant breached its duty in not removing the tree or recommending removal of the tree. At trial, Plaintiffs introduced an invoice showing that Defendant trimmed two trees on Lyle Henderson's property on September 27, 2005.[14] Defendant does not dispute that it trimmed the subject tree on this date. It is also not disputed that Defendant needs permission from both BCLP and the property owner before it can remove a tree. The notes section of the invoice did not include a recommendation that the subject tree be removed. Defendant did not introduce any evidence suggesting it did recommend removal. The Jury could therefore reasonably infer that Defendant assessed and pruned the tree in question and did not recommend its removal.

Plaintiffs relied on their expert witness, Jaak Gilmore, to support the theory that Defendant's failure to remove the tree or recommend removal was a breach of its duty of care. Mr. Gilmore is a certified arborist who has worked in the tree trimming business for twenty-three years.[15] Mr. Gilmore testified that, based on his review of the evidence—which included around 300 photos, two police reports, and the agreement between Defendant and BCLP[16]—the tree at issue should have been removed.[17] Mr. Gilmore explained that he would have removed the tree

---

[14] Trial Tr. Edward Boyd 111:21–112:12 (Docket No. 236).

[15] Trial Tr. Jaak Gilmore 196:21–24, 210:13–16 (Docket No. 237).

[16] *Id.* at 197:13–98:17.

[17] *Id.* at 211:14–18.

based on the fast-growing nature of the tree, the tree's proximity to the side of the powerline, and the wording of the contract between BCLP and Asplundh.[18]

Defendant argues that Mr. Gilmore's testimony is insufficient to establish that Defendant breached its duty of care because Mr. Gilmore testified that the ANSI 3000 standards create the industry standards for tree pruning and also testified that the ANSI standards do not require removal of a fast growing tree growing to the side of powerline.[19] This argument is not persuasive. This Court has held that evidence of industry standards does not conclusively establish the legal standard of care, but instead serves as evidence to consider in assessing the standard of care.[20] Therefore, that ANSI 3000—the industry standards—may not require removal of all fast growing trees situated to the side of a powerline does not, as a matter of law, establish that Defendant's failure to remove or recommend removal of this particular tree was not a breach of its duty of care. Here, Mr. Gilmore testified the tree should have been removed and based his conclusion on his experience, the contract between the parties, and the location and species of the tree. This testimony provides an evidentiary basis on which the Jury could

---

[18] *Id.* at 211:18–25, 247:2–8.

[19] *Id.* at 246:11–247:1.

[20] *Amos v. W.L. Plastics, Inc.*, No. 2:07-CV-49 TS, 2009 WL 5197143, at *4 (D. Utah Dec. 22, 2009) (unpublished) ("The fact that a person deviates from or conforms to an accepted custom or practice does not establish conclusively that the person was or was not negligent."); *see also RJW Media, Inc. v. CIT Grp./Consumer Fin., Inc.*, 2008 UT App 476, ¶ 20, 202 P.3d 291 (holding "standard-of-care-in-the-industry evidence" should be emphasized in establishing the standard of care where it has not yet been established by law).

reasonably find that Defendant breached its duty of care in failing to remove or recommend removal of the tree.

Even if Plaintiffs had not presented sufficient evidence to show that Defendant breached its duty by failing to remove or recommend removal of the tree, Plaintiffs presented sufficient evidence on which the Jury could rely to find Defendant breached its duty of care by pruning the subject branch with a stub cut.

Mr. Gilmore testified that photos of the subject branch taken after the accident revealed that the branch had received a stub cut.[21] He further testified that making a stub cut is against industry standards.[22] Referring to the photos taken at the property after the accident, Mr. Gilmore testified he was able to identify where the stub cut had been made.[23] Mr. Gilmore concluded that, based on the length the branch had grown from the point of the stub cut and the standard rate of growth for a Siberian elm, the stub cut was made around the same time Defendant pruned the subject tree.[24]

Mr. Gilmore further testified that, upon his review of the evidence, he found no documentation or other evidence that BCLP had pruned the tree after Asplundh.[25] BCLP employees confirmed that no documentation could place BCLP at Lyle Henderson's property between September 27, 2005, and the date of the accident.[26]

---

[21] Trial Tr. Jaak Gilmore 221:9–17 (Docket No. 237).

[22] *Id.* at 219:1–20.

[23] *Id.* at 221:16–222:17.

[24] *Id.* at 229:18–230:14.

[25] *Id.* at 229:24–230:2.

[26] *See* Trial Tr. VerNaun Gines 865:1–4 (Docket No. 231).

Defendant argues that it is entitled to judgment as a matter of law because "[t]he fact that Asplundh trimmed the tree in September of 2005, coupled with Mr. Gilmore's rough estimate, does not *outweigh* the significant testimony placing BCLP . . . at Mr. Henderson's property."[27] As previously discussed, for purposes of a judgment as a matter of law, the Court cannot weigh the evidence. The Court may only determine whether the non-movant provided some evidentiary basis to support the jury verdict. Mr. Gilmore's testimony is sufficient to provide the Jury with an evidentiary basis to find that Defendant breached its duty of care by failing to recommend removal of the tree and by improperly trimming the tree. The Court therefore denies Defendant's renewed Motion for judgment as a matter of law on the issue of liability.

Unlike a motion for judgment as a matter of law, motions for a new trial allow the district court to weigh the evidence presented at trial. As previously noted, however, a court is not to disturb the jury's verdict absent clear, decided, or overwhelming evidence to the contrary.

At trial, Defendant presented testimony that BCLP, not Asplundh, was more likely to have made the stub cut on the subject branch because BCLP made regular visits to Mr. Henderson's property to restore power,[28] BCLP's line crews frequently make stub cuts when restoring power to a line or when requested by the landowners,[29] and because BCLP often

---

[27] *See* Def.'s Mot., at 26 (Docket No. 250) (emphasis added).

[28] *See e.g.*, Trial Tr. Layne Hartvigsen 882:13–21 (Docket No 231); Trial Tr. Tyler Parkin 873:9–18 (Docket No. 231); Trial Tr. Kent Gines 809:21–23 (Docket No. 238); Trial Tr. Mary Waters 1085:18–25 (Docket No. 239).

[29] Trial Tr. VerNaun Gines 838: 8–23, 839:7–24 (Docket No. 231); Trial Tr. Kent Gines 811:20–812:18 (Docket No. 238).

trimmed trees out of a bucket truck as opposed to climbing through the trees to trim them like Asplundh.[30]

Though this evidence presented by Defendant may support a finding that BCLP, not Asplundh, performed the stub cut, the evidence does not clearly, decidedly, or overwhelmingly outweigh the evidence presented by Plaintiffs. Plaintiffs presented evidence that Asplundh trimmed the subject tree in 2005, that no concrete evidence could place BCLP at Mr. Henderson's property between the time Defendant's crew trimmed the trees and the accident, and that the tree growth from the stub cut showed that the stub cut was performed around the time Defendant trimmed the subject tree. The Court therefore denies Defendant's request for a new trial on the basis of liability.

## B. DAMAGES RELATED TO BRAIN INJURY

Defendant next moves for partial judgment as a matter of law regarding damages related to J.S.M.'s alleged brain injury. Defendant alternatively moves for a new trial on the same grounds.

Plaintiffs' evidence supporting that J.S.M. suffered a brain injury was primarily provided by the expert testimony of Dr. Sam Goldstein, a board certified practicing pediatric neuropsychologist with an extensive list of specialty certifications and publications.[31] Defendant argues that Dr. Goldstein's testimony does not support the Jury's verdict awarding damages for a brain injury because (1) Dr. Goldstein is not a medical doctor and therefore is not qualified to

---

[30] Trial Tr. Brent Thomas 134:8–136:9 (Docket No. 236).

[31] Trial Tr. Sam Goldstein 367:21–374:5 (Docket No. 230).

diagnose J.S.M. with a brain injury, and (2) Dr. Goldstein's conclusion that J.S.M. will not be able to attend graduate school is not sufficiently connected to the evidence at trial.

First, as previously stated, a renewed motion for judgment as a matter of law is limited to the subject matter raised in the movant's first motion for judgment as a matter of law. At the close of Plaintiffs' case-in-chief, Defendant orally moved for judgment as a matter of law and partial judgment as a matter of law. Relevant here, Defendant challenged the sufficiency of Dr. Goldstein's opinion that J.S.M. would not obtain certain advanced degrees. Defendant's oral motion did not challenge Dr. Goldstein's qualifications to opine on whether J.S.M. suffered injury to his brain as a result of the electrocution. Dr. Goldstein's qualifications are therefore not properly before the Court.

Defendant argues that excluding this argument from consideration employs an overly strict interpretation of the case law. Defendant correctly states that preserving an issue for review in a motion for judgment as a matter of law at the close of evidence does not require "[t]echnical precision," but need only "adequately notify the court of issues being raised."[32] However, Defendant has not met this standard. "While Rule 50 'does not require technical precision in stating the grounds of the motion, it does require that they be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion.'"[33]

---

[32] *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1114 (10th Cir. 2005) (quoting *Cummings v. Gen. Motors Corp.*, 365 F.3d 944, 950 (10th Cir. 2004)).

[33] *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1229 (10th Cir. 2000), *aff'd,* 532 U.S. 588 (2001) (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2533 (1995)).

"Thus, the moving party must 'specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.'"[34]

Defendant argues that its challenge to Dr. Goldstein's conclusions regarding J.S.M.'s ability to earn advanced degrees sufficiently notified the Court and the opposing party that Defendant challenged Dr. Goldstein's testimony and therefore effectively preserved the issue of Dr. Goldstein's qualifications. Defendant's Reply memorandum includes several citations in support of this argument. However, none of the cited cases offer support for the proposition that challenging the testimony of a particular witness on one issue will preserve all issues related to the testimony of the same witness.[35]

While Defendant did challenge the sufficiency of Dr. Goldstein's testimony to support the conclusion that J.S.M. would not obtain certain advanced degrees, Defendant did not mention any objection to Dr. Goldstein's qualifications to testify regarding J.S.M.'s likelihood of brain injury such that the Court and Plaintiffs were aware of Defendant's position on the matter. Therefore, the issue of Dr. Goldstein's qualifications was not preserved for consideration.

Even accepting Defendant's argument that the issue was properly preserved, Defendant's underlying argument that Dr. Goldstein is not qualified to testify regarding the existence of a brain injury fails. Dr. Goldstein is an expert in the field of pediatric neuropsychology. He has a bachelor's degree in psychology, a master's degree in physiological psychology, and a PhD in

---

[34] *Miller*, 396 F.3d at 1114 (quoting Fed. R. Civ. P. 50(a)(2)).

[35] *See Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*, 94 F.3d 655, at *2–3 (10th Cir. 1996) (unpublished table decision); *Anderson v. United Tel. Co. of Kan.*, 933 F.2d 1500, 1504 (10th Cir. 1991); *Miller*, 396 F.3d at 1114–15.

school psychology.[36] Dr. Goldstein is currently a nationally certified school psychologist and the only board certified pediatric neuropsychologist in the State of Utah. His clinical work primarily consists of consulting and treating children with developmental, genetic, and injury-related cognitive problems.[37] Dr. Goldstein testified that he personally examines 150 to 200 people—primarily children—a year, about half of which have suffered a brain injury.[38] In addition to his clinical work, Dr. Goldstein has authored textbooks, trade books, and test manuals in the field of neuropsychology that are used around the country in both academic and clinical settings.[39]

Additional testimony presented at trial by both parties further supports that neuropsychologists are qualified to offer an opinion on the existence of a brain injury. Plaintiffs' expert Dr. Judith Gooch, a medical doctor specializing in medicine and rehabilitation, testified that a neuropsychological evaluation "is a good way" to evaluate a subject's thinking and emotional abilities and figure out "if there is a problem."[40] Defendant's own expert Dr. Brandon Zielinski, a pediatric neurologist, testified that he can and will refer patients to neuropsychologists to determine if their cognition has been affected.[41] Given Dr. Goldstein's extensive experience in the field of pediatric neuropsychology, specifically as it relates to assessing and treating cognitive injures, the Court finds Dr. Goldstein is qualified to offer an expert opinion that J.S.M. suffered a brain injury as a result of the accident.

---

[36] Trial Tr. Sam Goldstein 368:8–16 (Docket No. 230).

[37] *Id.* at 367:24–368:4.

[38] *Id.* at 374:2–376:6.

[39] *Id.* at 371:24–372:5.

[40] Trial Tr. Judith Gooch 309:21–310:5 (Docket No. 237).

[41] Trial Tr. Brandon Zielinski 1169:22–1173:5 (Docket No. 240).

Dr. Goldstein testified that he based his conclusions on a review of J.S.M.'s medical records, information provided by J.S.M.'s parents and teacher, J.S.M.'s family history, and a five-hour neuropsychological examination.[42] He explained in some depth the testing administered during J.S.M.'s neuropsychological examination. The administered testing measures the subject's abilities, knowledge, and skills.[43] The various tests produce scores, which Dr. Goldstein then analyzes. J.S.M. scored well above average in areas mostly related to "acquired knowledge," such as receptive vocabulary, expressive vocabulary, and verbal comprehension.[44] These types of skills are largely dependent upon the child's environment.[45] Given these strengths exhibited by J.S.M., Dr. Goldstein testified that he would expect J.S.M. to score equally high in areas related to abilities and skills, absent "any intervening variable."[46] However, many of J.S.M.'s scores reflective of his achievement and abilities were lower than expected.[47] Dr. Goldstein then sought to determine the cause of this unexpected disparity. Dr. Goldstein testified that there is no history of learning disability, attention problems, or developmental problems in JSM's family that would explain the discrepancy.[48] Notably, J.S.M.'s biological family has an impressive academic history. However, understanding the details of J.S.M.'s electrocution, Dr. Goldstein concluded that, to a reasonable degree of

---

[42] Trial Tr. Sam Goldstein 385:7–18, 388:21–389:1 (Docket No. 230).

[43] *Id.* at 372:14–373:10.

[44] *Id.* at 401:18–402:23.

[45] *Id.* at 392:20–24.

[46] *Id.* at 402:24–403:3.

[47] *Id.* at 404:3–405:7.

[48] *Id.* at 403:24–404:3.

neuropsychological probability, the disparity was due to a brain injury caused by the electrocution.[49]

Dr. Gooch's testimony also supports Dr. Goldstein's conclusion. Dr. Gooch reviewed Dr. Goldstein's findings and testified that the types of cognitive and psychological issues exhibited by J.S.M. are "typically seen in people with injury to the brain."[50] She further testified that "high voltage electrical injury can and often does cause injury to the brain."[51]

The above testimony provides sufficient grounds by which the Jury could reasonably find that J.S.M. suffered an injury to the brain as a result of his electrocution. To support the claim that J.S.M. did not suffer a brain injury, Defendant relied on the opinion of Dr. Zielinski. Dr. Zielinski testified that, based on his review of J.S.M.'s medical records and an independent examination of J.S.M., J.S.M. had not suffered a brain injury.[52] This testimony does not clearly, decidedly, or overwhelmingly outweigh the evidence supporting the Jury's findings. As such, Defendant has not provided grounds for a new trial regarding J.S.M.'s alleged brain injury.

Next, Defendant argues Dr. Goldstein's testimony does not support the conclusion that J.S.M. will not be able to attend graduate school. Dr. Goldstein testified that, at the time he tested J.S.M., J.S.M. had average abilities.[53] He opined that as J.S.M. ages, his development will remain average in comparison to his peers. Dr. Goldstein further testified that only two to five percent of the population obtain an advanced degree, and that J.S.M.'s current

---

[49] *Id.* at 405:8–407:4.

[50] Trial Tr. Judith Gooch 310:6–18 (Docket No. 237).

[51] *Id.* at 310:10–12.

[52] Trial Tr. Brandon Zielinski 1152:21–1153:9 (Docket No. 240).

[53] Trial Tr. Sam Goldstein 410:4–10 (Docket No. 230).

neuropsychological abilities and academic scores do not support the prediction that J.S.M. will be able to obtain a post-graduate degree.[54] He also testified that the areas in which J.S.M. scored low are much more powerful predictors of a person's success.[55]

Ultimately, Dr. Goldstein concluded that, absent the electrocution, he would expect that all of J.S.M.'s scores would be consistent with the high scores he received in the areas related to knowledge.[56] This conclusion is further supported by J.S.M's family's impressive academic history and Dr. Goldstein's testimony that the education level of a person's biological parents is the best single predictor of the level of achievement a child will obtain.[57]

Defendant argues the conclusion that J.S.M. will not attend graduate school as a result of the electrocution is not sufficiently supported by Dr. Goldstein's trial testimony, and therefore, the Jury must have relied on impermissible speculation in awarding damages for lost future earning capacity. The Court has previously ruled that the information on which Dr. Goldstein relied and referenced in his expert report was sufficiently connected to his ultimate conclusion that J.S.M.'s scholastic opportunities will be limited as a result of the accident.[58] Dr. Goldstein referenced and elaborated on the same information to reach the same conclusions in his trial testimony. Dr. Goldstein's testimony is therefore sufficient to provide the Jury with an evidentiary basis to find that, it is more likely than not that J.S.M. is not able to obtain certain

---

[54] *Id.* at 410:13–22.

[55] *Id.* at 412:24–413:14.

[56] *Id.* at 412:13–24.

[57] *Id.* at 411:25–412–6.

[58] *See* Docket No. 132.

advanced degrees. Accordingly, the Court denies Defendant's request for partial judgment as a matter of law on the issue of J.S.M.'s alleged brain injury.

Regarding Defendant's request for a new trial on this issue, Defendant's evidence rebutting the testimony of Dr. Goldstein regarding J.S.M.'s inability to earn a graduate degree was limited to Dr. Zielinski's testimony that it is unlikely J.S.M. suffered a brain injury. As previously discussed, Dr. Zielinski's testimony does not clearly outweigh the evidence presented by Plaintiffs. The Court therefore denies Plaintiffs' request for a new trial on the issue of J.S.M.'s alleged brain injury.

## C. APPORTIONMENT OF FAULT

Defendant argues for a new trial on the basis that the Jury's decision not to apportion fault to BCLP or Lyle Henderson was against the great weight of the evidence. Because Defendant sought to apportion fault to BCLP and Lyle Henderson at trial, Defendant had the burden to prove each of the elements of negligence against those to which it sought to apportion fault.

### 1. Bountiful City Light and Power

As a power utility company, BCLP has a high duty of care in managing its powerlines.[59] Defendant argued and presented evidence that BCLP breached this high duty of care because: (1) BCLP had, and continues to have, frequent problems with power outages[60] caused by tree growth but does not place fast growing trees, like the Siberian elm at issue, on a more frequent

---

[59] *See* Jury Instruction No. 26.
[60] Trial Tr. Allen Johnson 687:8–689:3 (Docket No. 238).

pruning cycle;[61] (2) BCLP dealt with a number of power outages at Mr. Henderson's property caused by the trees and was therefore aware that they posed a problem;[62] (3) BCLP was ultimately responsible for the safety of the powerlines and oversaw Defendant's work on the lines by directing its clearance crews where to trim, requiring a weekly report, and generally observing and overseeing Defendant's work;[63] (4) BCLP employees did not contact Defendant after the accident because they did not feel that Defendant was at fault for the branch coming down;[64] and (5) Plaintiffs asserted a claim against BCLP, which was ultimately settled.[65]

In opposition, Plaintiffs presented evidence that BCLP did not breach its duty of care by failing to trim more frequently or otherwise monitoring the tree because BCLP relied on Defendant to trim the trees sufficiently such that they would not need to be revisited before the expiration of the standard trimming cycle. Plaintiffs presented testimony that, no matter the condition of the tree upon arrival, Defendant should have trimmed the tree such that the tree would not be a hazard for the standard trimming cycle of four to five years.[66] This four-to-five-year standard applies even when trimming fast growing trees like the Siberian elms at issue.[67] It is not disputed that Defendant trimmed the trees on Mr. Henderson's property on September 27, 2005, and that the tree failed on June 30, 2009—three years and nine months after Defendant

---

[61] Trial Tr. Edward Boyd 144:17–145:21 (Docket No. 236).

[62] *See e.g.* Trial Tr. Layne Hartvigsen 889:12–22 (Docket No. 231); Trial Tr. VerNaun Gines 848:22–849:22 (Docket No. 231).

[63] Trial Tr. Allen Johnson 702:6–703:25 (Docket No. 238); Trial Tr. Brent Thomas 751:4–13 (Docket No. 238).

[64] Trial Tr. Allen Johnson 720:14–24 (Docket No. 238).

[65] *Id.* at 717:23–718:20.

[66] Trial Tr. Edward Boyd 108:13–109:12 (Docket No. 236).

[67] *Id.* at 106:24–108:24.

pruned the trees. Plaintiffs therefore contended that BCLP was under no duty to check on or trim the subject tree prior to the accident because the accident occurred before the standard trimming cycle expired.

Additionally, Plaintiffs presented evidence that BCLP could not be at fault for the stub cut which allegedly caused the tree to fail. As discussed, Plaintiffs presented evidence that no matter the condition of the tree on arrival, Defendant had a duty to trim it to standard.[68] Therefore, Plaintiffs argued that, even if BCLP did perform an improper cut on Mr. Henderson's trees prior to September 27, 2005, Defendant should have fixed any improper cuts when completing its contractual line clearance duties. Plaintiffs also presented evidence that BCLP could not have performed the stub cut after September 27, 2005. As discussed, Mr. Gilmore testified that the length of the tree growth from the stub cut showed that the cut was made around the time Defendant trimmed the tree and if BCLP had trimmed the branch at a later date, the branch would have been shorter.[69] Further, Plaintiffs emphasized that Defendant could not offer any concrete evidence placing BCLP at Mr. Henderson's property from the time Defendant trimmed the trees in 2005 to the date of the accident in 2009.[70] Plaintiffs therefore presented sufficient evidence to support the Jury's finding that BCLP was not contributorily at fault for J.S.M.'s injuries.

Further, that the Jury chose not to credit BCLP employees' testimonies that BCLP did not believe Asplundh was at fault is not against the clear weight of the evidence. A jury may

---

[68] *Id.* at 109:11–111:8.

[69] Trial Tr. Jaak Gilmore 229:18–230:14 (Docket No. 237).

[70] *See* Trial Tr. VerNaun Gines 864:13–866:1 (Docket No. 231).

properly believe or disbelieve a witness for a number of reasons.[71] Plaintiffs elicited testimony from BCLP employees on which the Jury could rely to infer that BCLP had an interest in the outcome of the case given the business relationship between BCLP and Defendant and the personal relationship between Brent Thomas, former BCLP superintendent, and Edward Boyd, Asplundh's regional supervisor.[72]

Finally, that BCLP settled with Plaintiffs does not provide overwhelming evidence that BCLP was at fault. As stated in the Jury Instructions, there are a number of reasons why a party may settle a lawsuit and the jury "must not consider the settlement as a reflection of the strengths or weaknesses of any person's position."[73]

Based on the above, Defendant's evidence that BCLP was negligent does not clearly outweigh the evidence presented by Plaintiffs that BCLP was not negligent. Defendant has therefore not shown that it is entitled to a new trial on the issue of fault apportionment to BCLP.

### 2. Lyle Henderson

Defendant also argues the Jury's finding that Lyle Henderson was not at fault is against the clear weight of the evidence. At trial, Defendant presented evidence that Lyle Henderson was negligent because he never called BCLP to ask them to trim or remove the trees, despite being aware that the trees were growing above the powerlines.[74] Defendant further presented testimony

---

[71] *See* Jury Instruction No. 6.

[72] *See* Trial Tr. Allen Johnson 690:13–692:21 (Docket No. 238); Trial Tr. Brent Thomas 788:18–789:3 (Docket No. 238).

[73] Jury Instruction No. 25.

[74] Trial Tr. Lyle Henderson 287:13–288:9 (Docket No. 237).

that BCLP regularly receives phone calls from concerned residents requesting that BCLP trim or remove trees growing close to powerlines.[75]

Plaintiffs did not dispute that Mr. Henderson was aware that his trees grew above the powerlines and never called BCLP to request they trim or remove the trees. However, Plaintiffs did present evidence that Mr. Henderson had no special knowledge regarding line clearance and could therefore defer to certified arborists to determine when and how his trees should be trimmed.[76] The Jury could therefore reasonably find that Mr. Henderson did not breach his duty of care by not calling BCLP to request they trim or remove the trees.

Defendant also presented evidence that Mr. Henderson breached his duty of care by not allowing BCLP to remove the trees and requesting the minimum amount be removed when allowing the trees to be trimmed. Mr. Layne Hartvigsen, a BCLP employee, testified that on each of three or four times visiting Mr. Henderson's property, BCLP wanted to remove the trees, but was not given permission.[77] Ms. Mary Waters, Mr. Henderson's tenant, testified that builders of a church next to Mr. Henderson's property wanted to remove the trees in his yard, but Mr. Henderson only allowed the removal of some of the trees and not the tree that caused the accident.[78] Ms. Waters also testified that she believed Mr. Henderson limited the amount that BCLP could trim when he allowed the trees to be trimmed.[79] Finally, Mr. Thomas and Mr.

---

[75] Trial Tr. VerNaun Gines 844:11–845:9 (Docket No. 231).

[76] Trial Tr. Lyle Henderson 295:10–24 (Docket No. 237).

[77] Trial Tr. Layne Hartvigsen 890:24–891:14 (Docket No. 231).

[78] Trial Tr. Mary Waters 1079:4–1081:4 (Docket No. 239).

[79] *Id.* at 1085:4–11.

Johnson both testified that, after the accident, Mr. Henderson was "hesitant" to allow BCLP to remove the trees, though he did eventually allow it.[80]

By contrast, Mr. Henderson testified that he always gave permission for the trees to be trimmed,[81] that prior to the accident BCLP had never asked him for permission to remove the trees, and that he would have allowed the trees to be removed if given a good reason.[82] This testimony provided a sufficient basis for the Jury to find that Mr. Henderson allowed his trees to be trimmed and that he would have allowed the tree to be removed if asked. That several witnesses testified contrary to Mr. Henderson does not amount to overwhelming evidence contrary to the verdict. As previously stated, there are many reasons a jury may believe the testimony of one witness and not the testimony of others.

The evidence presented by Defendant that Mr. Henderson was negligent does not clearly, decidedly, or overwhelmingly weigh against the Jury's verdict. The Court therefore denies Defendant's request for a new trial on fault apportionment.

D. EXCESSIVE DAMAGES

Defendant moves for an order of remittitur or a new trial on the issue of damages. Defendant argues that the damages are excessive in the amount of $735,500.00—representing the amount of damages awarded related to J.S.M.'s brain injury—or, at a minimum, $429,424.00—representing the amount awarded for lost future earnings.

---

[80] Trial Tr. Allen Johnson 715:1–717:3 (Docket No. 238); Trial Tr. Brent Thomas 778:4–6 (Docket No. 238).

[81] Trial Tr. Lyle Henderson 279:8–24 (Docket No. 237).

[82] *Id.* at 280:7–282:11.

As previously discussed, the testimony of Plaintiffs' expert neuropsychologist, Dr. Goldstein, sufficiently supported the Jury's finding that J.S.M. suffered an injury to his brain and that, as a result, he will not be able to earn a graduate degree like his parents.

Relying on Dr. Goldstein's findings, Plaintiffs' medical rehabilitation expert, Dr. Gooch, testified that J.S.M. would need certain treatments and accommodations throughout his life to help him with day-to-day functioning, some of which are related to the alleged brain injury.[83] Plaintiffs' expert, Ms. Sheryl Wainwright, a certified nurse and life care planner, relied on both Dr. Goldstein's and Dr. Gooch's conclusions, among other things, to offer an opinion on the costs J.S.M. will incur throughout his life as a result of the injuries caused by the electrocution, including those related to his alleged brain injury.[84] Plaintiffs' expert Ms. Dina Galli, a vocational rehabilitation specialist, testified of the differences in median wage earnings based on education level.[85] Finally, Plaintiffs' expert Mr. Jeremy Sharpe, an economist, provided the Jury with the resulting monetary computations.[86]

A grant of remittitur requires a finding that the damages awarded by the jury "are so grossly excessive as to shock the judicial conscience." A new trial requires a finding that the evidence presented at trial overwhelmingly outweighs the jury's verdict. The testimonies summarized above provide clear support for the Jury's verdict. The Court will therefore deny Defendant's request for remittitur and its alternative request for a new trial on the issue of damages.

---

[83] Trial Tr. Judith Gooch 313:4–318:17 (Docket No. 237).

[84] Trial Tr. Sheryl Wainwright 450:1–457:6 (Docket No. 230).

[85] Trial Tr. Dina Galli 515:2–18 (Docket No. 230).

[86] *See generally* Trial Tr. Jeremy Sharpe 550–61 (Docket No. 243).

## IV. ADDITIONS TO THE FINAL JUDGMENT

Plaintiffs request that pre-judgment interest, post-judgment interest, and the allowable court costs be added to the final judgment.

Under the 2009 amended version of Section 78B-5-824 of the Utah Code, the prevailing party is entitled to pre-judgment interest on "special damages actually incurred" calculated at "7.5% simple interest per annum, from the date of the occurrence of the act giving rise to the cause of action to the date of entering the judgment." Plaintiffs actually incurred $193,760.00 in past medical expenses and are therefore entitled to pre-judgement interest on this amount. Defendant does not object to Plaintiffs' calculation of $111,199.66 as the appropriate amount of pre-judgment interest under the statute.

Under 28 U.S.C. § 1961(a), Plaintiffs are also entitled to post-judgment interest at the federal statutory rate to be calculated from February 23, 2017—the date of the entry of judgment.

Finally, as the prevailing party, Plaintiffs are entitled to certain court costs. Plaintiffs filed the requisite declaration and memorandum requesting $10,139.86 in costs. Plaintiffs' Bill of Costs includes costs in the amount of $62.50 for shipping and postage. These costs are not taxable under 28 U.S.C. § 1920.[87] The Court will therefore deduct $62.50 from the total amount requested by Plaintiffs, bringing the amount of allowable court costs to $10,077.36.

## V. CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for a New Trial or Remittitur (Docket No. 250) is DENIED. It is further

---

[87] *See Roth v. Spruell*, 388 F. App'x 830, 837 (10th Cir. 2010).

ordered that Plaintiffs' Motion for the Inclusion of Pre-Judgment Interest, Post-Judgment Interest and Costs in the Final Judgment (Docket No. 234) is GRANTED.

DATED this 15th day of June, 2017.

BY THE COURT:

Ted Stewart
United States District Judge